UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID ANTHONY BRITTON JR., | ) | CASE NO. 4:15 CV 637 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff, David Anthony Britton, Jr. ("Britton"), seeks judicial review of the final decision of the Commissioner of Social Security denying his claim for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act ("Act"). This matter is before the court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be AFFIRMED.

## I.  Procedural History

Plaintiff applied for supplemental security income in August 2011.  (Tr. 224-30.)  Mr. Britton alleged his disability began on August 27, 2008.[1] (Tr. 224.)  Mr. Britton's application was denied initially and after reconsideration.  (Tr. 192-198.)  On June 4, 2012, Mr. Britton requested an administrative hearing.  (Tr. 199-200.)

A hearing was held before the Administrative Law Judge ("ALJ"), M. Scott Kidd, on July 11, 2013.  (Tr. 72-114.)  The ALJ issued a decision on November 26, 2013, finding that Britton was not disabled.  (Tr. 52-70.)  On December 18, 2013, Britton requested review of the ALJ's decision by the Appeals Council.  (Tr. 49-51.)  The Appeals Council denied review on February 11, 2015, rendering the ALJ's November 26, 2013 decision final.  (Tr. 4-10.)

Plaintiff commenced this timely request for review of the ALJ's decision on March 31, 2015.  Defendant Answered filed the transcript of the administrative proceedings on June 25, 2015.  Plaintiff filed a motion for summary judgment[2] and a brief on the merits on August 26, 2015.  Defendant's brief on the merits was filed on December 11, 2015, making the matter ripe for the court's review.

## II.  Evidence

### A.  Personal, Educational and Vocational Evidence

Britton was born in 1976 and was 35 years old on the date his application was filed.  (Tr. 78.)  He has a GED. (Tr. 79.)  Britton's past relevant work includes work as an auto body repair technician.  (Tr. 100.)

---

[1] Britton previously filed applications for Social Security Disability benefits ("SSD") and SSI on April 26, 2005, alleging disability beginning September 2, 2002 and denied by ALJ decision dated August 28, 2008 (Tr. 164-177.)

[2] The court overruled the motion for summary judgment by order entered December 7, 2015.

## B.  Medical Evidence

### 1.        Dr. Robert Brodell, Treating Dermapathologist

Britton began treating with a dermapathologist,  Dr. Robert Brodell, M.D., on June 28, 2005. (Tr. 434.)  Plaintiff reported that he had plaques on his legs, elbows, knees, and scalp. (Tr. 434,550.)  Upon examination, Dr. Brodell assessed that plaintiff had psoriasis over 25% of his body.  (Tr. 434.)  Dr. Brodell prescribed several different medications. (Tr. 422-434.)  When plaintiff saw Dr. Brodell in August 2005, he reported that he was doing great on his new medication, although his psoriatic arthritis did not improve, Dr. Brodell assessed a fifty percent improvement of plaintiff's psoriasis.  (Tr. 434, 550.)

Plaintiff saw Dr. Brodell in March 2006 and reported that he experienced significant flares when he cut back the frequency of Enbrel to every other week.  (Tr. 432, 548)  Dr. Brodell observed some scaling and redness on plaintiff's scalp but other than that, plaintiff's psoriasis was well controlled.  (Tr. 432.)  Dr. Brodell increased the frequency of plaintiff's psoriasis medication to once every ten days.  (Tr. 432.)  In August 2006, Dr. Brodell assessed plaintiff's psoriasis as clear and eliminated some of the creams from plaintiff's medication regimen.  (Tr. 368.)  In November 2006, plaintiff reported that he was doing very well but had developed a few lesions on his leg after a bad flu.  (Tr. 368.)  Plaintiff presented to Dr. Brodell in March 2007 and reported that he was "nearly completely clear," but was having some trouble with his psoriatic arthritis.  (Tr. 430.)

When plaintiff visited Dr. Brodell in February 2008, he reported that he had stopped taking his medication for about six months because he had lost his job and could no longer afford it.  (Tr. 430.)  Dr. Brodell determined that plaintiff's psoriasis and psoriatic arthritis were flaring because he was off his medicine.  (Tr. 430.)  In August 2008, plaintiff reported that he was doing

"much better" since resuming his psoriasis medication.  (Tr. 429.)  Dr. Brodell noted that plaintiff's plaques improved 80%-90% and continued his psoriasis medications.  (Tr. 429.)  In November 2008, plaintiff told Dr. Brodell that he was 99% clear and Dr. Brodell assessed his psoriasis as well controlled.  (Tr. 429.)  Dr. Brodell also noted that plaintiff's psoriatic arthritis was still problematic and referred plaintiff to rheumatologist, Dr. Rochell Rosian, for a psoriatic arthritis consultation.  (Tr. 428)

In February 2009, plaintiff reported that he was doing extremely well.  Dr. Brodell noted some lesions on plaintiff' leg and scalp. (Tr. 428.)   Dr. Brodell also noted that plaintiff's psoriatic arthritis was still problematic. (Tr. 428.)

In May 2009, Dr. Brodell assessed plaintiff psoriasis and psoriatic arthritis as coming under control.  (Tr. 428.)  During an August 2009 follow-up appointment with Dr. Brodell, plaintiff reported that he "has been in pretty good shape with his psoriasis," but that his psoriatic arthritis was "uncomfortable."  (Tr. 427.)  In December 2009, plaintiff reported that his psoriasis mediation was working well and that he had no negative reactions to it.  (Tr. 370.)  Dr. Brodell's treatment notes state, "[s]moking also aggravates his psoriasis so it is important for him to stop smoking for a lot of reasons."  (Tr. 370.)

In March 2010, plaintiff again reported that he was doing really well.  (Tr. 370.)  Dr. Brodell's assessment was that plaintiff's psoriasis was 95% better and that his arthritis was "well controlled from the Methotrexate that he gets from Dr. Rosian."  (Tr. 370.)

In June 2010, Dr. Brodell noted that plaintiff's psoriasis was clear but for one plaque on the left shin and another on the right lower leg. (Tr. 369.)  Plaintiff was tolerating his psoriasis medication well "without any neurologic symptoms, infections, injection site reactions or other problems."  (Tr. 369.) Dr. Brodell assessed plaintiff's psoriasis as 95% better at this visit.  (Tr.

369.)  In November 2010, plaintiff reported that he had missed two or three doses of Enbrel because he had missed an appointment when he was sick.  (Tr. 369.)  His exam revealed several patches of psoriasis and his medication frequency was increased.  (Tr. 369.)

In February 2011, Dr. Brodell's treatment notes reveal that plaintiff was "improving nicely with breaking up of patches on his legs, elimination of most of the patches on his trunk, scalp still has some activity."  (Tr. 367.)  In May 2011, plaintiff reported that he was getting "better and better" because of the medications he had been prescribed by Dr. Brodell and Dr. Rosian.  (Tr. 366.)  Dr. Brodell's notes indicate that plaintiff's psoriasis is probably 90% better and his psoriatic arthritis is half better. (Tr. 366.)   In November 2011, Dr. Brodell assessed plaintiff's psoriasis as "greatly improved with just a little bit of activity now."  (Tr. 552.)  Dr. Brodell administered a Kenalog injection during that visit.  (Tr. 538.)

Plaintiff visited Dr. Brodell again on February 23, 2012.  (Tr. 552.)  Dr. Brodell's notes show that plaintiff had a patch of psoriasis on his left shin, a patch on the left lower leg and a patch on his right elbow. (Tr. 552.)  The patches were breaking up pretty well and Dr. Brodell assessed that plaintiff's psoriasis was largely controlled.  (Tr. 552.) Dr. Brodell administered another Kenalog injection during this visit.  (Tr. 538.)

Plaintiff's visits to Dr. Brodell continued in 2013.  On January 13, 2013, an examination revealed unchanged findings. (Tr. 848.)  Dr. Brodell administered a Kenalog injection during this visit.  (Tr. 848.)  On February 13, 2012, plaintiff's psoriasis was better over the right elbow but he had some active areas over his legs.  (Tr. 848.)  Dr. Brodell continued the plaintiff's medication plan and administered a Kenalog injection. (Tr. 848.)

5

### 2.     <u>Dr. Santuccio Ricciardi – Treating Physician</u>

Mr. Britton has treated with Dr. Santuccio Ricciardi since at least August 6, 2008.  (Tr. 628.)  In January 2010, Britton complained of back pain to Dr. Ricciardi.  (Tr. 614.)  On examination, Dr. Ricciardi observed that plaintiff's exam was mostly normal with the exception of a few rhonchi or abnormal breath sounds.  (Tr. 614.)  Dr. Ricciardi prescribed pain mediation with no refills.  (Tr. 614.)

In August 2010, plaintiff saw Dr. Ricciardi to have stitches removed.  (Tr. 609.)  Plaintiff reported that he was injured at home working on a box.  (Tr. 609.)  Dr. Ricciardi removed the stitches and noted that the wound looked clean with no significant problems.  (Tr. 609.)

In November 2010, plaintiff complained of pain in his shoulder, neck and back.  (Tr. 725.)  Dr. Ricciardi did not note any abnormal findings in his office notes.  (Tr. 725.)  Plaintiff's condition was noted as stable with a guarded prognosis.  (Tr. 725.)

Plaintiff saw Dr. Ricciardi again in January 2011 with complaints of fatigue and knee, shoulder, and back pain.  (Tr. 722.)  Dr. Ricciardi assessment indicates that plaintiff has chronic pain secondary to psoriasis and psoriatic arthritis, obstructive pulmonary disease and tobacco use.  (Tr. 722.)  Mr. Britton was instructed to continue the same treatment.  (Tr. 722.)

Plaintiff returned to Dr. Ricciardi in April 2011 to obtain a tuberculosis test.  (Tr. 592.)  Dr. Ricciardi's notes indicate that plaintiff has chronic complaints of arthralgias, pain, and shortness of breath.  (Tr. 720.)  Plaintiff's exam was normal with the exception of diminished breath sounds and psoriasis of the left leg.  (Tr. 720.)  Dr. Ricciardi's assessment states "psoriasis, and psoriatic arthritis (questionable.)"  (Tr. 720.)  He was instructed to continue his medication and to follow up with all physicians involved in his care.  (Tr. 720.)

He followed up with Dr. Ricciardi on June 7, 2011. (Tr. 727.)  Plaintiff reported he was doing "fair," with no chest pain.  (Tr. 727.)  He complained that his shortness of breath, fatigue, and arthralgias continued.  (Tr. 727)  Dr. Ricciardi's examination findings were consistent with his April 2011 visit, except Dr. Ricciardi observed no abnormal breathing sounds and noted that plaintiff was still smoking a pack of cigarettes per day. (Tr. 727.)

On August 8, 2011, Mr. Britton visited Dr. Ricciardi and complained that his joints were still bothering him.  (Tr. 607.)  An exam revealed rhonchi in the lungs bilaterally.  (Tr. 607.)  Dr. Ricciardi  diagnosed  psoriasis/psoriatic  arthritis,  anxiety,  chronic  pain  and  mediastinal adenopathy.  (Tr. 607.)    Dr. Ricciardi ordered a CT scan for further evaluation and advised plaintiff of tobacco cessation again.  (Tr. 607.)

The August 2011 CT scan of plaintiff's chest revealed lung nodules, suspected tracheal diverticulum and an incidental hypo attenuating lesion at the inferior margin of the spleen possibly representing a hemangioma versed cyst.  (Tr. 499-500.)

At an October 2011 follow-up appointment with Dr. Ricciardi, plaintiff reported feeling "okay" but that his arthritis was worse.  (Tr. 733.)  Dr. Ricciardi did not change any of plaintiff's medications.  (Tr. 733.)  He referred plaintiff to a specialist, Dr. Digvijay Singh, for further evaluation of the new nodule appearing on plaintiff's lung in the August 2011 CT scan.  (Tr. 733.)

In June 2012, plaintiff presented to Dr. Ricciardi for a regular appointment.  (Tr. 841-842.)  His exam was mostly normal with the exception of shortness of breath or abnormal breath sounds.  (Tr. 841-842.)  Plaintiff saw Dr. Ricciardi again in March 2013 for arthritis.  (Tr. 855-856.)  Plaintiff was noted to be "well."  (Tr. 855.)

### 3.  Dr. Rochelle Rosian, Treating Rheumatologist

Mr. Britton was referred to Dr. Rosian for an evaluation of psoriatic arthritis.  (Tr. 689.)
Plaintiff's first office visit with Dr. Rosian was on February 27, 2009.  (Tr. 395, 689.)  Dr.
Rosian's notes indicate that plaintiff had been on Enbrel for three to four years for skin and joint
problems, had pain in the shoulders and back for over a year, and pain in his hips for several
months.  (Tr. 689.)  The notes also state that plaintiff had suffered trauma to his back and that
injections and physical therapy had failed to resolve the injury.  (Tr. 689.)  On examination, Dr.
Rosian noted that plaintiff did not appear to be in acute distress, had normal heart and lung
sounds, no back pain to palpation, and a normal gait.  (Tr. 689.)  However, she did note that he
had swelling and tenderness in his wrist, some left knee swelling, reduced hip range of motion
and painful shoulder range of motion.  (Tr. 690-91.)  Dr. Rosian diagnosed inflammatory
polyarthoropathy, psoriasis, and chronic obstructive asthma.  (Tr. 691-692.)  Dr. Rosian added
Methotrexate to plaintiff's prescriptions.  (Tr. 692-693.)

Dr. Rosian reviewed the X-rays that were taken of plaintiff in March 2009.  (Tr. 705-
706.)  After reviewing the X-rays, she recommended that he exercise regularly and continue on
his current medications. (Tr. 706.)

Plaintiff presented to Dr. Rosian on September 27, 2011 with increased joint pain. (Tr.
389.) Dr. Rosian's notes indicate that plaintiff had fluid on his right knee again. (Tr. 389.)  The
notes also indicate that plaintiff has noticed increased shoulder pain and stiffness and that his
hips were bothering him.  (Tr. 389.)  Her examination revealed limited range of motion in the
shoulders; swelling in the elbows, wrists and knees; tenderness in the bilateral wrists knees and
joints of the hands and fingers; limited range of active motion in the left hip; and psoriasis over
the elbow and scalp.  (Tr. 390.)  Dr. Rosian diagnosed psoriatic arthritis, knee effusion, and

bilateral hip pain.  (Tr. 390-391.)  She administered an injection of Depo Medrol into the right knee. (Tr. 391.)  At the time, plaintiff's prescriptions included Enbrel, Vicodin, Methotrexate, and Folic Acid.  (Tr. 392.)  An X-ray taken that day revealed mild superior narrowing of both hips, probably due to mild degenerative changes.  (Tr. 394.)

Plaintiff had another office visit with Dr. Rosian on February 3, 2012.  (Tr. 531.)  The office notes reveal little change from his previous evaluation.  (Tr. 531.)  Plaintiff informed Dr. Rosian that his knee was locking up and giving way and that he was awakened with pain when sleeping.  (Tr. 531.)  Dr. Rosian's notes state that Mr. Britton is "on his way to Sandusky in a few days, for kalhari [sic]." (Tr. 531.)  Her notes also indicate that plaintiff will plan on an injection to his right knee next week.  (Tr. 533.)

### 4. Dr. Digvijay Singh, Critical Care Specialist

On October 12, 2011, plaintiff was evaluated by pulmonologist Dr. Digvijay Singh on the referral of Dr. Ricciardi.  (Tr. 561, 674, 733.)  Plaintiff reported that he had shortness of breath and tightness in chest even performing simple activities around the house.  (Tr. 488.)  Plaintiff reported that he had started smoking at age 13 and had built up to two packs per day, but had cut down to four to five cigarettes per day.  (Tr. 488.)  Dr. Singh's exam revealed that plaintiff appeared well and breathed comfortably, walked with a normal gait and had completely normal strength.  (Tr. 489.)   However, the exam also revealed that he had some harsh vesicular breath sounds in all lung fields.  (Tr. 489.)  Dr. Singh reviewed a CT scan from August 2011 that revealed new changes on the right middle lobe compared to a previous study in 2005.  (Tr. 491.)  However, the lung nodules "remained stable as compared to previous studies of 2005 consistent with benign etiology." (Tr. 489.)  Dr. Singh diagnosed shortness of breath, wheezing, tobacco use disorder, allergic rhinitis, cough emphysema, lung nodule and psoriasis.  (Tr. 493, 675.)  Dr.

Singh ordered additional testing and instructed plaintiff to continue using Albuterol for wheezing and shortness of breath.  (Tr. 493.)

Plaintiff returned to Dr. Singh for a follow-up appointment on December 8, 2011, following blood work and a pulmonary function study.  (Tr. 488.)  Dr. Singh's physical exam revealed a normal gait and normal motor strength.  (Tr. 489.)  The pulmonary function test revealed predominantly restrictive lung disease of mild to moderate severity, associated with a slight decrement in DLCO's (diffusion capacity of the lung), suggestive of an interstitial asthma.  (Tr. 494-496.)  In his notes, Dr. Singh commented that plaintiff's "symptoms of shortness of breath, wheeze and exercise intolerance are disproportionate to the abnormalities noted on pulmonary function studies and interstitial changes noted on the CT scan."  (Tr. 490.)  The notes also indicate that plaintiff has "significant neuromuscular weakness."  (Tr. 490.)  Dr. Singh diagnosed solitary pulmonary nodule, chronic obstructive asthma, shortness of breath, wheezing, lymph nodes enlargement, tobacco use disorder, allergic rhinitis, psoriasis, idiopathic interstitial pneumonia, instrinsic asthma, generalized muscle weakness, and diplopia.  (Tr. 490.)  Dr. Singh added Advair to plaintiff's other medications.  (Tr. 490.)

### 5.  Opinion Evidence

#### a.  Treating Source – <u>Dr. Ricciardi</u>

In September 2011, Dr. Ricciardi provided a medical source statement indicating that plaintiff suffers from psoriatic arthritis, COPD, back pain, hypertension and mediastinal adenopathy.  The letter states that, in Dr. Ricciardi's opinion, plaintiff is "totally disabled."

Dr. Ricciardi provided another medical source statement on January 9, 2012. (Tr. 666-667.)  In this letter, Dr. Ricciardi relates that he first treated plaintiff on July 21, 2006. (Tr. 666-667.)  Plaintiff's diagnoses are listed as psoriasis, psoriatic arthritis, asthma, chronic obstructive

pulmonary disease, pulmonary nodules, back pain and anxiety disorder. (Tr. 666-667.)  Dr. Ricciardi indicates that the clinical findings to support his diagnosis are, "subjective complaints of arthralgias as back pain, restrictive lung disease. (Tr. 666-667.)  Based on pulmonary function tests by pulmonary medicine the patient has restrictive lung disease." (Tr. 666-667.)  In this letter, Dr. Ricciardi indicates that, in his opinion, Mr. Britton can sit for one to two hours during an eight hour day. (Tr. 666-667.)  He cannot sit continuously and must move around every hour. (Tr. 666-667.)  He further opines that Mr. Britton can lift 10 pounds frequently and occasionally 10 to 20 pounds. (Tr. 666-667.)  He places no restrictions on Mr. Britton's ability to reach or on his ability to grasp or twist objects. (Tr. 666-667.)  Dr. Ricciardi states that he believes his patient's symptoms would increase if he was placed in a competitive work environment and that his condition interferes with his ability to keep his neck in a constant position. (Tr. 666-667.)  He also reports that plaintiff is prone to infections and is taking immunosuppressive drugs including Enbrel.  (Tr. 666-667.)

### b.  Treating Source – Dr. Rosian

Dr. Rosian completed a rheumatoid arthritis impairment questionnaire in February 2012. (Tr. 516-522.)  She diagnosed psoriatic arthritis and lumbago.  (Tr. 516.)  She reports that plaintiff experienced pain, inflammation, and/or limitations of motion in the neck, mid and lower back, pelvis, bilateral shoulders, right knee, bilateral hips, and right elbow.  (Tr. 516.)  Clinical findings included abnormal gait, reduced range of motion in the neck and hip, reduced grip strength bilaterally, tenderness in the neck and low back, joint warmth in the knees, joint deformity in the right knee, crepitus in the knees and right elbow, sausage digits in the fingers, and swelling and pain in the Achilles and elbow.  (Tr. 517.)  Under section 6 requesting that she identify "laboratory test results" supporting her diagnosis, Dr. Rosian marked that an elevated

11

sedimentation rate supported her diagnosis.  (Tr. 517.)  She listed plaintiff's primary symptoms as stiffness in the morning, swelling and limited range of motion in the neck, shoulders, hips and spine, swelling in the knees and constant moderate to severe pain in the right knee, neck and shoulders.  (Tr. 518.)  Dr. Rosian rated Mr. Britton's pain as moderate (6) on a good day, and severe (9) on a bad day, on a 10 point scale.  (Tr. 519.)  Dr. Rosian indicated that the limitations detailed in her questionnaire were present since February 2009.  (Tr. 522.)

In her questionnaire, Dr. Rosian opined that, in an eight hour work day, plaintiff could sit for one hour or less and could stand/walk for one hour or less. (Tr. 521.)  She opined that he could frequently lift five pounds and could occasionally lift 20 pounds and could carry 10 pounds. (Tr. 520.)  Dr. Rosian reported that plaintiff is not a malingerer.  (Tr. 520.)  She represented that his symptoms were frequently severe enough to interfere with attention and concentration.  (Tr. 520.)  She also opined that plaintiff was incapable of tolerating even low stress because he used so much energy to manage his pain that she did not believe that stress would be easy to manage.  (Tr. 521.)  She indicated that he would need to take hourly 10 minute breaks or rests during an eight hour workday.  (Tr. 521.)  She estimated that he would miss two to three days of work per month.  (Tr. 521.)  She also indicated that he needed to avoid fumes, gases, temperature extremes, dust and heights.  (Tr. 521.)  She also reported that he would not be able to work at a regular job that involved pushing, pulling, kneeling, bending or stooping.  (Tr. 521.)  Her handwritten note indicates that plaintiff's shoulders, neck and back would really limit his ability to do anything with his hands.  (Tr. 521.)

### c. SSA Consultative Psychologist - <u>John J. Brescia, M.A.</u>

Mr. Brescia evaluated plaintiff at the request of the Social Security Administration on November 16, 2011.  (Tr. 412-422.)  Mr. Brescia diagnosed depressive disorder and nicotine

dependence.  (Tr. 420.)  Mr. Brescia assigned a GAF score of 55 to plaintiff.  (Tr. 419-420.)  Mr. Brescia determined that plaintiff was exhibiting low average cognitive functioning.  (Tr. 420.)  He opined that plaintiff would have difficulty at times in handling some of the pressures and demands present in a work environment. (Tr. 421.)  Brescia noted that plaintiff was depressed, preoccupied with his condition and related problems, and may not always deal with situational stressors effectively.  (Tr. 421-422.)

### d. SSA Consultative Examiner – Sushil M. Sethi, M.D.

On August 8, 2013, after the administrative hearing, Dr. Sushil M. Sethi evaluated plaintiff at the request of the ALJ.  (Tr. 898-904.)  Plaintiff reported that he had cut down to 10 cigarettes a day. (Tr. 898.)   He reported that his mediations were controlling his arthritis symptoms well and that he did not use any ambulatory aids.  (Tr. 898.)  On examination, Dr. Sethi found that plaintiff was not in acute distress, had no edema, a normal range in his arms, legs, hips and ankles, no muscle weakness in his arms, a normal gait without limping, and an intact neurological system.  (Tr. 899-900.)  He noted mild tenderness along plaintiff's cervical spine.  (Tr. 899-900.)  He also noted limited range of cervical motion in forward flexion and extension to 50 degrees, right and left lateral flexion to 40 degrees, and bilateral rotation to 60 degrees, generalized tenderness in the lumbar spine, and limited lumbar range of motion in forward flexion to 60 degrees, extension to 15 degrees, right and left lateral flexion to 20 degrees, and rotation to the right and left to 35 degrees.  (Tr. 899-900.)  Dr. Sethi's impression notes report a history of rheumatoid arthritis with no evidence of laxity of ligaments or synovitis in any of the joints; minimal tiny areas of psoriasis in the skin in the upper and lower extremities, no infection in any of the areas; chronic obstructive pulmonary disease and tobacco use; and gastroesophageal reflux. (Tr. 900.)  Dr. Sethi issued the following medical source statement:

Based on my objective findings, the claimant's ability to do work-related physical activities such as sitting standing, walking, lifting, carrying and handling objects may be moderately affected.  He is capable of sitting 6 hours, walking 2 hours and stand 2 hours in an 8-hour shift.  He can carry 20-25 lb frequently and 30-50 lb occasionally.  His hearing, speaking and traveling are normal.

### e. State Agency Reviewer – <u>Dimitri Teague, M.D.</u>

State agency physician, Dr. Dimitri Teague, reviewed plaintiff's medical records on December 26, 2011.  Dr. Teague found that plaintiff could perform light work including occasionally lifting or carrying up to twenty pounds, frequently lifting or carrying up to ten pounds, standing and/or walking for a total of about six hours in an eight hour workday, and sitting for a total of about six hours in an eight-hour workday.  (Tr. 140.)  Dr. Teague also determined that plaintiff could occasionally climb ladders, ropes or scaffolds, balance, stoop, kneel, crouch, and crawl.  (Tr. 140-141.)  Dr. Teague indicated that plaintiff had to avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (Tr. 140-141.)  Dr. Teague's notes indicate that he adopted the ALJ decision of August 28, 2008.  (Tr. 141.)

### f.  State Agency Reviewer – <u>Gerald Klyop, M.D.</u>

State agency physician, Dr. Gerald Klyop, reviewed the plaintiff's medical records and assessed his physical limitations in April 2012.  Dr. Klyop affirmed Dr. Teague's opinion and also adopted the prior ALJ's RFC findings.  (Tr. 155, 157-159.)

## C.    Testimonial Evidence

### 1.  Britton's Testimony

Mr. Britton was represented by counsel and testified at the hearing.  (Tr. 5-100.)  Britton testified that he lives in a house with his teenage daughters.  (Tr. 78.)  He attended school through the 9th grade and obtained his GED.  (Tr. 79.)  He does not drive very often because it makes his shoulders hurt.  (Tr. 79.)  He is 6 feet tall and weighs 205 pounds.  (Tr. 79.)

Mr. Britton wears a brace on his right knee.  (Tr. 80.)  He has a TENS unit and uses it for a couple of hours a day.  (Tr. 80)

Britton has not worked anywhere since 2008.  (Tr. 80.)  He previously worked as an auto body technician.  (Tr. 80.)  He also previously worked as a driver delivering milk to schools. (Tr. 81-82.)  Britton testified that he hasn't worked because he has a hard time concentrating. (Tr. 83.)  He is afraid to walk because his knee gives out on him.  (Tr. 83.)  Britton testified that he fell at Walmart because his knee gave out on him.  (Tr. 88.)  After that, he was given a brace to help support his knee so he wouldn't fall.  (Tr. 88.)  Britton testified that he wears the brace every day.  (Tr. 88.)

He also stated that he experiences pain in his shoulders and he is unable to sleep.  (Tr. 83.)  Britton testified that he normally does not sleep for more than five or ten minutes at a time. (Tr. 86.)  Britton testified that he has been prescribed several different medications for his sleeping problem, but that none of them are resolving his sleep issues.  (Tr. 86-87.)  Britton represented that he experiences fatigue due to his lack of sleep.  (Tr. 93-94.)

Britton experiences pain in his hips, knees, shoulders, elbows and his right wrist.  (Tr. 86.)  He complains of swelling in his joints on an almost daily basis.  (Tr. 86.)  Britton testified that the only things that really help his pain are soaking in his Jacuzzi and putting his feet up in his recliner.  (Tr. 86.)  During the ALJ hearing, Britton stood up due to pain in his hips and back. (Tr. 98.)  He testified that he normally wants to get up 10 to 15 minutes to ease the pain he experiences.  (Tr. 98.)  On good days he testified that he can go every 15 to 20 minutes before he needs to stand.  (Tr. 98.)  On bad days, he testified that he needs to move up or down every five minutes.  (Tr. 98.)

15

Britton also described headaches that he suffers on a weekly basis.  (Tr. 95-96.)  He testified that he experiences headaches two or three times a week.  (Tr. 95.)  His headaches last a couple of hours.  (Tr. 95.)  Britton's physician prescribed Excedrin for his headaches.  (Tr. 95.)  When he gets a headache, Britton takes medication and lies down.  (Tr. 96.)

Britton also stated that he has shortness of breath every day.  (Tr. 88.)  He is taking medication to help with his breathing.  (Tr. 88.)  However, his shortness of breath affects his ability to climb steps.  (Tr. 93.)  He also stated that any exposure to fumes, dust, odors, or chemical smells would affect his breathing.  (Tr. 93.)  Britton also testified that hot or cold weather affected his breathing.  (Tr. 97.)

When questioned regarding his psoriasis, Britton explained that his condition is currently in "decent" control with the various creams and medications he has been prescribed.  (Tr. 89.)

With regard to mental health, Mr. Britton testified that he stopped seeing any type of mental health professional because he did not feel that it was helping.  (Tr. 89.)  However, he is still taking Cymbalta for depression. (Tr. 89.)  Britton testified that he has crying spells about once a week and does not have much of an appetite.  (Tr. 89.)  He reported very low energy levels.  (Tr. 90.)

Britton testified that his typical day consists of watching movies and alternating between lying on the floor and his chair.  (Tr. 90.)  His teenage daughters prepare his food, do most of the chores around the house, and the yard work.  (Tr. 89-90.)  Britton does not have access to the internet and doesn't use a computer much.  (Tr. 92.)   He testified that he doesn't go anywhere except to doctor visits.  (Tr. 91.)  He also goes to the grocery store to buy groceries, but goes with his daughters because it bothers his back to push the cart.  (Tr. 94.)  Britton's physician

gave him a handicap plate so that he would not have to walk as far when he goes shopping.  (Tr. 99.)

Britton denied any alcohol or marijuana use.  (Tr. 92.)  He also denied any thoughts of harming himself or others.  (Tr. 92.)  Britton testified that he does not have panic attacks.  (Tr. 92.)

### 2. Vocational Expert's Testimony

Vocational Expert ("VE"), Barbara Burk, testified at the hearing.  (Tr. 100-113.)  The VE considered Britton's past work to be automobile body repair, a heavy to very heavy job classification.  (Tr. 101.)

The ALJ asked the VE to assume that a person with the same age, education, and work experience as the claimant was limited to light work.  (Tr. 101.)  The hypothetical also assumed that the individual could occasionally climb stairs and ramps, but could not climb ladders, ropes or scaffolds.  He could occasionally stoop, kneel, crouch, and crawl. (Tr. 101.)  He would also need to avoid concentrated exposure to extreme temperatures and respiratory irritants such as fumes, odors, dust, gases and poor ventilation.  (Tr. 101.)  The hypothetical also limited the worker to unskilled work that would consist of simple, routine, repetitive tasks, performed in a static environment that would experience few if any changes with no strict time or fast pace, high volume production quotas.  (Tr. 101.)

The VE testified that such a person would not be able to perform Mr. Britton's past work.  (Tr. 101.)  However, such a person would be able to work as a housekeeping cleaner.  (Tr. 102.)  In northeastern Ohio, there are more than 2,600 such jobs and nationally, there are more than 230,000.  (Tr. 102.)  Such an individual would also be able to work as an automatic car wash attendant, with 850 jobs available in northeastern Ohio and 65,000 nationally. (Tr. 102.)  Finally,

the VE testified that such a person could work as a cashier.  (Tr. 102.)  She represented that there are over 6,000 such jobs in northeastern Ohio and more than 533,000 nationally.  (Tr. 102.)

For the second hypothetical, the VE was instructed that the person described in hypothetical number 1 was also limited to frequent reaching in all directions with the bilateral upper extremities.  (Tr. 102.)  This additional limitation did not change the jobs that the individual would be able to perform.  (Tr. 102.)  There was also no change to the jobs he could perform when the ALJ added the limitation of "frequent contact or interaction with others."  (Tr. 102.)

The ALJ then modified the hypothetical to an individual who would be required to sit or stand for a total of four hours and would need to alternate between sitting and standing every 30 minutes.  (Tr. 103.)  With this modification, the VE testified that the individual would be limited to sedentary work.  (Tr. 103.)  Such an individual would still be capable of performing the job of cashier.  (Tr. 103.)  The VE also testified that this individual would be able to perform the work of a telephone solicitor as long as he could stand very briefly and then return to the seated position.[3]  (Tr. 104.)  There are approximately 5,300 such jobs in northeastern Ohio and about 172,000 in the United States.  (Tr. 104.)  The VE also listed a small products assembler as a job which the individual would be able to perform.[4]  (Tr. 104.)  There are approximately 500 jobs regionally and 38,000 nationally.  (Tr. 104.)  The VE opined that the individual would still be able to perform these jobs if the hypothetical were modified with the added limitations of frequent reaching in all directions and frequent contact and/or interaction with others.  (Tr. 104.)

---

[3] Plaintiff's attorney asked the ALJ to strike the job of telephone solicitor because he argued that the opinion of the VE was based on research presented at a conference, which had not yet been published. (Tr. 105.)  The research had also not included Ohio in its calculations.  (Tr. 105.)
[4] The VE later testified that this job would be eliminated by the hypothetical because reaching would be constant for this job.  (Tr. 112.)

The VE was questioned about the general toleration for an individual being off task.  (Tr. 104.)  She testified that at 15% there would be a reduction and erosion of the occupational base and that, if off task 20% of the time, there would be no jobs available in the market.  (Tr. 104.)  She also testified that absenteeism would be tolerated at a level of no more than once a month.  (Tr. 104.)

Plaintiff's attorney questioned the VE about an individual who would need to take an hourly ten minute break.  (Tr. 108.)  The VE testified that such an individual would be off task at least 20% of the time and there wouldn't be any jobs he could perform.  (Tr. 108.)  Plaintiff's attorney also questioned the VE about the car wash attendant job and whether that job would expose the employee to outdoor irritants and extreme temperatures.  (Tr. 109.)  Despite this line of questioning, the VE did not alter her opinion that the individual would be able to perform this job.  (Tr. 113.)

### III.  Standard for Disability

Under the Act, 42 U.S.C.  §  423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[5]....

---

[5] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[13] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden of producing evidence shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*  At all times, claimant has the burden of proving an entitlement to the benefits sought.

## IV.  The ALJ's Decision

The ALJ issued a decision on November 26, 2013.  A summary of his findings is as follows:

1. Britton had not engaged in substantial gainful activity since August 18, 2011, the application date.  (Tr. 58.)

2. Britton had the following severe impairments: psoriatic arthritis, psoriasis, chronic obstructive pulmonary disease ("COPD,") chronic back pain, mediastinal adenopathy and depression.  (Tr. 58.)

3. Britton does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  (Tr. 58.)

4. Britton has the residual functional capacity ("RFC") to perform light work, with the following additional limitations: he can occasionally climb stairs and ramps but he can never climb ladders, ropes or scaffolds.  He is only able to occasionally balance, stoop, kneel, crouch and crawl.  Britton can frequently reach bilaterally in all directions.  He must avoid concentrated exposure to temperature extremes and respiratory irritants such as fumes, odors, dust, gases and poor ventilation. Britton is limited to unskilled work that would consist of simple, routine and repetitive tasks performed in a static environment that would experience few if any changes, with no strict time requirements, fast-paced work or high volume production quotas.  The claimant can have frequent contact with others.  (Tr. 59-63.)

5. Britton is unable to perform any past relevant work.  (Tr. 63.)

6. Britton was born on March 15, 1976 and was 35 years old, which is defined as a younger individual age 18-44 on the date the application was filed.  (Tr. 63.)

7. Britton has at least a high school education and is able to communicate in English.  (Tr. 63.)

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  (Tr. 63.)

9. Considering Britton's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform.  (Tr. 63.)

Based on the foregoing, the ALJ determined that Britton had not been under a disability since August 18, 2011, the date his application was filed.

21

## V. Parties' Arguments

Plaintiff filed a brief on August 26, 2015.[6] (Doc. 9.)  Plaintiff argues that the ALJ failed to properly weigh the medical evidence and failed to properly determine Mr. Britton's residual functional capacity. (Doc. 9, pp. 12-17.)  Plaintiff points out that the ALJ assigned "little weight" to plaintiff's treating physicians, Dr. Ricciardi and Dr. Rosian. (Doc. 9, p. 13.)  Plaintiff argues that the treating physician's opinions were based on clinical findings and were consistent with the records.  (Doc. 9, pp. 13-14.)  Plaintiff contends that the ALJ improperly substituted his own interpretation of the medical data from the treating physicians.  (Doc. 9, p.14.)

Plaintiff also argues that the ALJ failed to properly evaluate Mr. Britton's credibility. (Doc. 9, pp. 17-18.)  Plaintiff argues that the ALJ did not properly evaluate Mr. Britton's medical history and/or his work history when the ALJ decided that Mr. Britton's statements regarding the intensity, persistence and limiting effects of his symptoms were not fully credible.  (Doc. 9, pp. 17-18.)

Defendant filed a brief on December 11, 2015.  (Doc. 14.)    Defendant argues that the ALJ cited substantial evidence in support of his physical residual functional capacity assessment. (Doc. 12, pp. 12- 15.)  Defendant contends that the diagnostic evidence showed mostly normal findings and that plaintiff remained stable over several years.  (Doc. 12, p. 13.)  Defendant also points to office notes from several different physicians which support the ALJ's determination. (Doc. 12, pp. 13-14.)  Defendant argues that the ALJ's assigning little weight to the opinions of Drs. Ricciardi and Rosian was fully explained and supported by substantial evidence which conflicted with the physicians' opinions.

---

[6] Plaintiff's brief was filed as a motion for summary judgment.  However, the court issued an order on December 7, 2015 indicating that the motion for summary judgment was denied as moot and that the court would consider the merits of plaintiff's brief after the case had been fully briefed by both sides. (Doc. 13, p. 2)

Defendant also argues that the ALJ reasonably assessed plaintiff's credibility.  (Doc. 14, pp. 20-24.)  The ALJ determined that Mr. Britton's testimony regarding the severity of his symptoms was inconsistent with multiple examination notes showing few abnormalities or mild to no clinical findings.  (Doc. 14, p. 21.)  The ALJ also determined that plaintiff's work history undermined his credibility.  Defendant argues that the ALJ's findings were supported by substantial evidence in the record and that he provided sufficiently specific reasons to support his analysis.  (Doc. 14, pp. 20-24.)  The court will consider the parties' arguments below.

## VI.  Law & Analysis

### A.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the

record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v.Callahan,* 109 F.3d 270, 273 (6th Cir. 1997).   This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliams v.*

*Astrue,* 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

### B.  Treating Physician Rule

The administrative regulations implementing the Social Security Act impose standards on the weighing of medical source evidence. *Cole v. Astrue,* 661 F.3d 931, 937 (6th Cir. 2011).  In making determinations of disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)-(6).  The ALJ is not required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical

25

opinion and the reasons for that weight." *Gayheart,* 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation marks omitted).

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007).  The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

The ALJ's "good reasons" must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart,* 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  As the Sixth Circuit has noted,

> the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id*. at 377.  On the other hand, the ALJ is not obligated to provide an "exhaustive factor-by-factor analysis."  *See Francis v. Comm'r of Soc. Sec.* 414 Fed. Appx. 802, 804 (6th Cir. 2011).

In coming to the decision that Britton has the residual functional capacity to perform sedentary work, the ALJ did not afford controlling weight to Drs. Ricciardi's and Rosian's opinions that Mr. Britton was limited to less than a full range of sedentary work.  (Tr. 62.)

In considering these treating physician's opinions, the ALJ stated,

> * * * I give little weight to these opinions.  Initially, I would note that they are inconsistent with the objective medical evidence discussed above.  That evidence does contain some positive findings but in general, there are multiple references to normal exams with no signs of edema or other motor, sensory, or neurological deficits. (internal citations omitted.)  Moreover, they are inconsistent with claimant's activities of daily living which show the ability to drive short distances and attending family events like a trip to a water park.  (internal citations omitted.)

(Tr. 62.)

The court should find that the ALJ's decision to assign little weight to Dr. Ricciardi's and Dr. Brodell's opinions is supported by the evidence in the case record.  The ALJ has provided a sufficiently specific explanation as to why he assigned little weight to these opinions.  The ALJ recognized that Mr. Britton has a long history of psoriasis and psoriatic arthritis, but pointed to several places in his medical records where his symptoms were well controlled and inconsistent with a finding of disability.  (Tr. 61.)  With regard to Dr. Rosian's report of limited range of motion, swelling and tenderness in Mr. Britton's knees, shoulders and wrists, the ALJ pointed to medical records indicating that steroid injections appeared to have decreased Britton's pain.  (Tr. 61.)

The ALJ also referenced the physical examination by Dr. Sethi on August 8, 2013.  The ALJ noted that Dr. Sethi observed no brawny edema and that his knees showed only a slight decrease in range of motion.  His gait was normal and he did not require any ambulatory aid.  His hips and ankles showed a normal range of motion and his upper extremities showed a normal

range of motion and strength. Dr. Sethi's findings were similar to many other exams conducted by the treating sources which revealed little to no significant clinical findings.

With regard to plaintiff's COPD, the ALJ found that the objective medical evidence was inconsistent with the alleged severity of the claimant's symptoms. (Tr. 61.) The ALJ pointed to the CT scan of Mr. Britton's chest taken in August 2011. This CT scan confirmed lung nodules but showed that they were relatively unchanged from 2005. The results of a pulmonary functions test administered in 2011 were consistent with bronchial asthmas and only mild to moderate restrictive lung disease. The ALJ also references Dr. Singh's note that claimant's alleged symptoms seemed disproportionate to the abnormalities noted on the test. The ALJ also points to specific notes in plaintiff's medical records evidencing that plaintiff was able to work around the house and to attend family events, like a trip to a water park. (Tr. 62-63.)

The ALJ provided sufficiently specific reasons for assigning little weight to Mr. Britton's treating physicians and the ALJ's reasons are supported by the evidence in the case record. Accordingly, the court should find no error in the ALJ's evaluation of Dr. Ricciardi's and Dr. Rosian's medical source statements.

### C. Credibility of Mr. Britton

Plaintiff also argues that the ALJ failed to properly evaluate the credibility of Mr. Britton. (Doc 9, p. 17.) It is for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997); *Crum v. Sullivan,* 921 F.2d 642, 644 (6th Cir. 1990); *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981). However, the ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." Soc. Sec. Rul. 96-7p, 1996 WL 374186, at * 4. Rather, such

determinations must find support in the record.  Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." *Rogers v. Comm'r of Soc. Sec.* 486 F.3d 234, 247 (6th Cir. 2007).  The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. Consistency of the various pieces of information contained in the record should be scrutinized. Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect.  *Id.*

Social Security Ruling 96-7p also requires that the ALJ explain his credibility determinations in his decision such that it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  *Id.*  In other words, blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence. *Id.*

In his decision, the ALJ indicates that Mr. Britton's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  The ALJ indicated that, "[i]n making this finding, I have considered additional factors that can contribute to claimant's credibility.  They include, but are not limited to, the claimant's work

history, treatment-seeking history, diagnostic test results, clinical observations and activities of daily living." (Tr. 60.) Elsewhere in his decision, the ALJ references different medical records and facts from plaintiff's testimony supporting this decision. Thus, the ALJ has provided a sufficiently specific explanation as to his assessment of plaintiff's credibility. The court should find that the ALJ's credibility determination is supported by the record.

## VII.  Conclusion

In summary, the court should find that the ALJ properly considered and weighed the evidence, including the medical opinion evidence and the credibility of Mr. Britton. The ALJ's decision is supported by substantial evidence. Britton has not demonstrated a basis upon which to reverse or remand the Commissioner's decision. For these reasons, it is recommended that the final decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. § 405(g).


s/Thomas M. Parker
Thomas M. Parker
United States Magistrate Judge

Date: May 4, 2016


**OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**